# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 687 | **DATE** | 1/10/2003 |
| **CASE TITLE** | PETER G. et al vs. CHICAGO PUBLIC SCHOOL DISTRICT NO. 299 et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Pursuant to Memorandum Opinion and Order entered this day, plaintiffs' motion for summary judgment is granted in part and denied in part. Summary judgment is entered in favor of plaintiffs and against defendant Chicago Public School District No. 299 in the amount of $10,426.91 on Count I and in favor of defendants Chicago Public School District No. 299 and Illinois State Board of Education and against plaintiffs on Counts II and III. This action is dismissed in its entirety. Any pending motions are moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JAN 13 2003 | |
| | Notified counsel by telephone. | | date docketed | 45 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 1/10/2003 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| | JS   courtroom deputy's initials | | JS   mailing deputy initials | |

(stamp text, reversed): U.S. DISTRICT COURT CLERK   03 JAN 13 AM 8:04   FILED ED ID

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



PETER G., a Minor and )
GREGORY G. and INEZ G., Individually and )
as Parents and Next Friend of Peter G., )
)
Plaintiffs, )
)
v. )       No. 02 C 0687
)
CHICAGO PUBLIC SCHOOL )
DISTRICT NO. 299 BOARD OF )
EDUCATION and ILLINOIS STATE )
BOARD OF EDUCATION, )
)
Defendants. )

<u>MEMORANDUM OPINION AND ORDER</u>

JAMES F. HOLDERMAN, District Judge:

On January 28, 2002, plaintiffs Peter G. ("Peter"), who is a minor, and his parents Gregory

G. and Inez G. (collectively, "plaintiffs") initiated the present proceeding in this court pursuant to

20 U.S.C. § 1415(i)(2) in order to appeal the administrative decisions of Richard Brimer, an

independent hearing officer ("IHO Brimer") appointed by the defendant Illinois State Board of

Education ("ISBE"). Specifically, plaintiffs appeal IHO Brimer's administrative decisions upholding

the defendant Chicago Public School ("CPS") District No. 299 Board of Education's ("defendant"

or "CPS Board") placement of Peter for the 2001-2002 school year at Blaine Elementary School

("Blaine"). On November 4, 2002, plaintiffs and defendant CPS Board filed cross motions for

summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below,

this court grants summary judgment in the amount of $10,426.91 in favor of plaintiffs and against

1

defendant CPS Board on count I, and grants summary judgment in favor of defendants CPS Board

and ISBE, and against plaintiffs in counts II and III.[1]

## PROCEDURAL AND FACTUAL BACKGROUND[2]

As discussed *infra* under the Standard of Review section, 20 U.S.C. § 1415(i)(2)(B) requires

this court to receive the records of the administrative proceedings, hear additional evidence at the

request of a party, and base its decision on the preponderance of the evidence. Despite being termed

---

[1] Both the CPS Board and the ISBE are defendants. The IDEA delegates supervisory authority to the state educational agency, the ISBE in this case, which is responsible for administering funds, setting up policies and procedures to ensure local compliance with the IDEA. See 20 U.S.C. § 1412. On the other hand, the local educational agency, CPS Board in this case, is responsible for the direct provision of services under the IDEA, including the development of an individualized education program for each disabled student. See 20 U.S.C. §§ 1413, 1414. In their first amended complaint, plaintiffs appeal the decision by ISBE-appointed IHO Brimer upholding CPS Board's individualized educational plan developed for Peter, and its placement of Peter at Blaine. Plaintiffs do not state any separate or distinct claims against ISBE in their supervisory role under the IDEA apart from their appeal of IHO Brimer's decision, and ISBE has not filed a motion for summary judgment in this case. Because in this opinion and order, this court finds no violation of the IDEA by the CPS Board, it follows that the ISBE also suffers no liability. Therefore, the disposition of this case as to defendant CPS Board also results in the termination of this case against defendant ISBE.

[2] On November 4, 2002, in addition to filing their motion for summary judgment, plaintiffs also filed a motion to supplement the administrative record. Attached to plaintiffs' motion to supplement was Exhibit A, which consisted of numerous documents plaintiffs submitted to IHO Brimer prior to the due process hearing, but which were not made part of the record. This court denies plaintiffs' motion to supplement the record with Exhibit A. In this court's September 13, 2002 opinion and order, this court permitted plaintiffs to discover and introduce a limited amount of supplemental evidence relevant to Peter's progress since the date of the administrative hearing. IHO Brimer did not consider the Exhibit A documents, they are not part of the administrative record, and they were not prepared subsequent to the administrative hearing; they are thus beyond the scope of the supplemental evidence this court allowed. Review of this evidence would bring this court's review dangerously close to a *de novo* review, which the Seventh Circuit has expressly cautioned against. See Patricia P. v. Bd. of Educ. of Oak Park, 203 F.3d 462, 470 (7th Cir. 2000) (A trial court "must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*."). It is also worth noting that the 316 pages of documents in Exhibit A are only referred to in six paragraphs of plaintiffs' 220-paragraph statement of uncontested facts.
 Plaintiffs have also submitted two large binders labeled Exhibits B and C to plaintiffs' motion for summary judgment, and a third binder containing Exhibits D-J, which appear to be exhibits to plaintiffs' motion as well, although they are not labeled as such. Defendant has moved to strike Exhibits B and C except for a limited number of documents for which defendant stipulates foundation and relevancy, and has moved to strike Exhibits D-J except for the specific references plaintiffs make to these exhibits in plaintiffs' Local Rule 56.1 statements. In making its determination as to the material facts, this court will consider Exhibits B-J only to the extent the materials in these exhibits were cited and referenced as evidence in plaintiffs' Local Rule 56.1(a) statements. In addition, this court will only consider those cited portions of Exhibits B-J which would be properly admissible at trial in form or content.

cross-motions for summary judgment, the motion for summary judgment is simply a "procedural vehicle" through which this court views the record and additional evidence and makes its decisions based a preponderance of the evidence. Heather S. v. State of Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997); Beth B. v. Van Clay, 211 F.Supp.2d 1020, 1025-26 (N.D. Ill. 2001) (aff'd 282 F.3d 493 (7th Cir. 2002). Accordingly, the factual background that follows is a version of the relevant material facts culled from the 1791 pages of administrative record and the supplemental evidence this court permitted, and as presented in plaintiffs' and defendant's Local Rule 56.1 statements.[3]

## I. Procedural Background

Peter is a five year old boy who has Down Syndrome and is cognitively delayed. In July 2000, defendant completed an individualized education program ("IEP") and declared Peter eligible to receive special education services from CPS when he reached the age of three in September 2000. Peter's parents placed him in St. Andrew school, a parochial school, in September 2000, and also began relying on and paying for private therapy services for Peter from Belle Center. Peter remained at St. Andrew for the remainder of the 2000-2001 school year. In December 2000, the parents initiated a due process hearing (2000 Hearing), which was later settled by the parties in May 2001.[4]

---

[3] On January 6, 2003, plaintiffs filed a motion to strike defendant's reply to plaintiff's Local Rule 56.1(b)(3) response to defendant's statement of uncontested facts and a motion to strike portions of defendant's 56.1(b)(3) response to plaintiff's statement of uncontested facts. Because in its Local Rule 56.1(b)(3) response, plaintiffs did not file a statement of additional facts pursuant to Local Rule 56.1(b)(3)(B), this court will strike defendant's reply to plaintiffs' Local Rule 56.1(b)(3) statement, which defendant incorrectly labeled "Reply to Plaintiff's Additional Facts." With respect to plaintiffs' motion to strike portions of defendant's Local Rule 56.1(b)(3) response, this court takes note of plaintiffs' specific objections and considers only those paragraphs of defendant's Local Rule 56.1(b)(3) response supported with sufficient evidence as required by Federal Rules of Civil Procedure 56(e) and Local Rule 56.1(b)(3)(A).

[4] On July 20, 2001, plaintiff's attorney submitted a fee demand of $10,426.91 for attorneys' fees incurred in the 2000 Hearing, and count I of plaintiffs' complaint is a claim for payment of this fee demand. Defendant has offered to pay plaintiffs the full amount of this demand. Plaintiffs seek a judgment thereon pursuant to Federal Rule of Civil Procedure 68.

CPS convened Peter's annual IEP conference on July 23, 2001. The IEP ("2001 IEP") developed that day found Peter eligible for special education services and provided for his placement in a regular preschool classroom with supportive services provided in the classroom. During the 2001 IEP conference, the possibility of placing Peter at Brennenman Elementary School ("Brennenman") was discussed, but was not formally announced. At the end of the 2001 IEP conference, Peter's parents immediately requested a due process hearing before leaving the meeting, prior to receiving formal notice of placement. Defendant sent plaintiffs a formal placement letter on July 30, 2001 designating Brennenman as Peter's placement for the 2001-2002 school year.

The ISBE appointed IHO Brimer to preside over the due process hearing ("2001 Hearing") challenging Peter's 2001 IEP. In September 2001, prior to the 2001 Hearing, Peter's parents re-enrolled Peter at St. Andrew with related supportive services from the Belle Center at their own expense. In early October, 2001, CPS changed its proposed placement for Peter from Brennenman to Blaine Elementary School ("Blaine") and IHO Brimer entered a Preliminary Decision finding that Peter's placement for the purposes of the IDEA "stay-put" provision to be Blaine. IHO Brimer conducted the 2001 Hearing over five days in October and November 2002, and issued a Decision and Order on December 15, 2001, which upheld the Blaine placement and ordered defendant to implement a training program for Blaine staff. On December 27, 2001, IHO Brimer issued a Clarification of his Decision and Order. Before this court are plaintiffs' timely appeal of IHO Brimer's Decision and Order pursuant to 20 U.S.C. § 1415(i)(2) and plaintiffs' claim for attorneys' fees incurred in the 2000 Hearing pursuant to 20 U.S.C. § 1415(i)(3)(B).

4

## II. Factual Background

### A. July 2001 IEP

On July 23, 2001, defendant convened Peter's annual IEP meeting. The 2001 IEP meeting lasted between 3-5 hours and was described by most participants as "long" or "lengthy." The 2001 IEP found Peter eligible for special education services and provided for placement in a regular preschool classroom with supportive services including speech and language services, occupational therapy and physical therapy. The 2001 IEP also provided that Peter's mode of communication is sign and that "total communication is to be used in all settings." (AR 166.) The "total communication" method combines finger spelling, signing, speech reading, speech, and auditory amplification to receive the message communicated.

The following CPS staff participated in the 2001 IEP meeting: 1) Kathy Kinsey, the Assistant Director of Citywide Special Education who was serving in the capacity of case manager at the IEP meeting; 2) Linda Mayster, a speech and language pathologist and CPS administrator; 3) Roberta Silver, a speech and language pathologist and CPS administrator; 4) Barb Zeber, a CPS early childhood special education facilitator who signed in as a District Representative; 5) Jay Kraning, attorney in the CPS due process and mediation unit; 6) Connie Bickford, CPS occupational therapist; 7) Stacey Knowles, CPS physical therapist; 8) Paula Polak, Peter's early childhood special education teacher who had serviced him during the year at St. Andrew's preschool; 9) Ron Alpern, CPS early childhood special education teacher who previously provided services to Peter; 10) Deanna Hunt, CPS general education teacher in physical education, who is certified in special education, early childhood special education and earl childhood education; 11) Ines and Gregory Grzeslo, Peter's parents; 12) Sara Mauk, plaintiffs' attorney's legal assistant and parent advocate. The notice of the

2001 IEP meeting provided to plaintiffs by defendant failed to list the names of four participants: Roberta Silver, Connie Bickford, Stacy Knowles, and Deanna Hunt.

At the time of the 2001 IEP meeting, Peter was attending the summer program at Resurrection preschool ("Resurrection"), a parochial school. Prior to the IEP meeting, a CPS occupational therapist and a CPS speech pathologist visited Resurrection and observed Peter. Outside reports from Resurrection, Belle Center, and various other experts were considered at the 2001 IEP meeting. Among other things, these reports noted that Peter was having a positive experience at Resurrection and that "continue[d] to use sign effectively with staff and some children," (AR 171-172), that Peter was more consistently communicating via use of sign language including single signs in combination with 2-3 word sign-combinations to label or request. (AR 173.) There was also evidence Peter was using an increased and expanded number of vocalizations and word approximations. (AR 173.) There was testimony at the 2001 Hearing that on May 8, 2001, when Peter was 3 years, 7 months old, Peter's functional ability was at the 19 month level, his socialization was at the 31 month level, his expressive language was at an 8-9 month level, and with signing, it was 18-20 months. Peter's parents note that the 2001 IEP listed three communication goals but did not address expansion of sign vocabulary, and listed "English" for all goals except communication, which lists "English and sign." The physical therapy goals in the IEP were written by Stacy Knowles, a CPS physical therapist who had not seen Peter in 12 months.

Peter's parents, their advocates, and the Belle Center representatives were given an opportunity to give input during the 2001 IEP meeting and they did not complain during the meeting about anyone's absence. Peter's parents advocated and prevailed in obtaining support services for Peter in a general education class, as opposed to a team model approach in a special education

classroom. (AR 291.) Suzanne Carr, the Belle Center speech pathologist and plaintiffs' expert, worked with CPS staff and actively participated in developing Peter's speech goals at the 2001 IEP meeting. Several participants testified that the parents and their advocate, Ms. Carr appeared to be in agreement with the speech goals that had been collaboratively written, and that overall, all participants appeared to agree on the goals and benchmarks that were written that day. At the 2001 Hearing, Ms. Carr testified that she agreed with "a portion" of the speech goals in the 2001 IEP, but that she "[did not] think they state all that could be accomplished and achieved in a year's time." (AR 1387.) Ms. Carr also testified that an IEP developed for Peter by the Belle Center contained "more independent goals" (AR 1387) that were "further in depth and really at Peter's level for what he [was] able to do at [that] time." (AR 1389.)

B. 2001 IEP Total Communication Proficiency and Training

Peter's IEP provides for communication through total communication with developmental signing. Total communication was defined at the 2001 Hearing as use of spoken English and use of sign language to support spoken English. Defendant's experts testified that developmental sign, which highlighted key words and used the same grammatical structure as spoken English would be easier for Peter and others to understand. Defendant's experts also testified that developmental sign meant signing to Peter at his level and not at that of a first-grader. There was testimony that teachers working with Peter should not have to greatly expand their signing vocabulary in working with Peter as he hopefully would start using spoken words and becoming an oral communicator. While signing for children with Down Syndrome is usually a transition to speech, there was also testimony that some children do remain non-verbal into their adolescent years. At home, Peter's mother does not sign every word to Peter, only key words. Plaintiffs' expert Lynn Pena testified that teachers using

7

total communication in the classroom should have sign proficiency higher than the student, and stated that 2 or 3 academic semesters of sign language are necessary to obtain sufficient proficiency. Plaintiffs' expert Suzanne Carr stated that in-service training for staff on inclusion was needed and that the lead teacher and speech language pathologist needed to sign above Peter's level, while other service providers needed a working vocabulary.

C. 2001 IEP School Placement

On July 30, 2001, CPS notified plaintiffs of Peter's placement at Brennenman in the preschool classroom of Michelle Jones. Ms. Jones was informed in August 2001 that Peter was going to enroll in her morning session but did not receive further information about Peter. Peter's parents did not enroll Peter at Brennenman. Instead, they requested a due process hearing and enrolled Peter at St. Andrew. Consequently, Ms. Jones gave Peter's spot in her classroom to another child and was not further informed about Peter's special needs or provided any training in sign language. In September 2001, after Peter was already enrolled at St. Andrew, Peter's mother visited Brennenman and found it unsatisfactory. Plaintiffs and defendant then discussed implementing Peter's IEP at Blaine and in early October 2001, CPS shifted Peter's placement to Blaine and assigned Peter to the pre-school classroom of Mary Ellen Rice.

Ms. Rice and her aide, Luis Gomez, had no prior training in sign language. Peter's parents' main concern was that no one would be able to communicate with Peter. The Blaine staff and therapists testified that they were willing to learn sign to work with Peter as part of total communication. There was discussion of implementing ongoing training to teach the staff functional sign, and discussion of utilizing Mary Alice Lavin, CPS itinerant teacher who had worked with Peter for the past year, to play a role in Peter's transition to Blaine. (AR 625.) However, Peter was still

enrolled at St. Andrew and training for the Blaine staff was not implemented or discussed with staff during October or November 2001. Peter remained enrolled at St. Andrew during the pendency of the 2001 Hearing result.

D. Evidence of Peter's Sign Language Ability

Peter is a hearing child. He is not deaf and can understand much more than he can express and is not solely relying on signs and facial expressions. Suzanne Carr testified that he understands routine commands without sign language. Peter's communication skills without sign language, however, are compromised. The record is conflicted as to exactly how many signs Peter knows. Peter's mother testified in October 2001 that Peter knew 174 signs. There was also evidence that around the time of the 2001 Hearing, Peter's parents stated to others that Peter knew 150-170 signs, but that Peter's parents had not personally observed it. Suzanne Carr also testified that in May 2001, Peter knew 140-150 signs. The record does not reveal whether Ms. Carr reached this figure by direct observation or from a parental report.

At the 2001 Hearing, Peter's independent physical therapist Margo Maresky testified that she knew at least 50 signs, maybe more, and that her use of sign enabled her to communicate with Peter and teach him. (AR 1436.) Peter's Belle Center occupational therapist Polly Toner who had been working with Peter weekly since October 2000 testified that she saw Peter use about 50 signs on a regular basis. Itinerant teacher Paula Polak who worked with Peter from October 2000 to June 2001 testified that she learned 25 signs through working with Peter during that time and there were only a few times she did not understand Peter's signs. CPS occupational therapist Connie Bickford testified that she knew about 20 signs and was able to work with Peter although she did not know all signs Peter used. Mary Alice Lavin, CPS itinerant teacher, had worked with Peter for over two

years at the time of the 2001 Hearing, and had a sign vocabulary of between 200 to 300 signs. She testified that she has not seen Peter use 170 signs and did not know how many signs he knew, and that occasionally, but not often, Peter used a sign she did not understand. Debbie Mytych, the director at Resurrection, estimated that Peter knew around 50 to 75 signs and used "same ones over and over for common things." (AR 1188.) Mrs. Mitchell, Peter's teacher at St. Andrews who saw him five days a week did not know how many signs Peter knew. Plaintiffs' education therapist expert, who did not know sign language, could not testify about the requisite level of sign proficiency a teacher working with Peter would need, but testified that a teacher should know more sign language than Peter. Mrs. Mitchell also testified that she did not know how long a sign language course would have to be to teach Peter's teachers and service providers a sufficient amount of sign.

E. Sign Proficiency of CPS Providers and Peter's Teachers at St. Andrews and Belle Center

Suzanne Carr, the Belle Center speech and language pathologist, took two sign language classes 10 years ago and picked up the rest of her 1200 sign vocabulary on the job. Polly Toner, the Belle Center occupational therapist, did not have formal training in sign prior to working with Peter one year ago. Ms. Toner received ongoing informal training from Ms. Carr, by self-study, and on-the-job experience, and testified that her knowledge of sign has been sufficient to meet Peter's needs.[5] Margo Maresky, Peter's physical therapist for 3 to 4 years, testified she never had formal training in sign and knew approximately 50 signs or more, which she learned from working with a speech and language pathologist, from books in the St. Andrew's classroom, and from Suzanne Carr.

---

[5] The hearing transcript states that Ms. Toner's sign vocabulary was 1,250 words. Defendant contends that "1250" in the transcript was a typographical error and Ms. Toner probably testified that she knew 250 signs because Ms. Toner informally learned all her signs from Suzanne Carr, who only knew 1,200 signs.

Anne Mitchell, Peter's lead teacher at St. Andrew testified that she'd taken three sign classes although the record is not clear whether she took these classes before Peter arrived. She further testified that she did not know whether the other teacher and aide had taken sign classes. Paula Polak, CPS itinerant teacher, worked with Peter from October 2000 to June 2001 and learned about 25 signs as she worked with Peter, and during that time, there were only a few times she did not understand Peter's signs. She further testified that she did not need to sign because Mrs. Mitchell the lead teacher was signing, although she also did not believe it was necessary for someone who signs to be constantly in the classroom with Peter. Mary Alice Lavin testified that she did not sign every word to Peter, and that she used functional sign in the same way Mrs. Mitchell did. She also stated that the other teacher and aide in St. Andrew's classroom learned as they went along and that she felt Peter's program could be professionally implemented at CPS. Stacy Knowles, CPS physical therapist, testified that when she observed Peter during his initial evaluation at Lakeview, nobody signed with Peter. Connie Bickford, CPS occupational therapist, testified that she knew about 20 signs picked up from teachers and Peter's mother. Ron Alpern, CPS physical therapist, testified that Peter's lead teacher should know about 20-30 signs.

Suzanne Carr testified that a teacher working with Peter would need to take a 6-9 month sign language course before working with him. She admitted that other members of her team from Belle Center had not had this training and did not know whether St. Andrew's staff had this level of formal training. Plaintiffs' expert Lynn Pena testified that Peter's teachers would have to have at least two academic semesters of sign language, possibly three, and also ongoing training before working with him.

11

F. <u>Training at Blaine</u>

In his decision and order, and subsequent clarification, IHO Brimer ultimately upheld defendant's placement of Peter at Blaine. As part of IHO Brimer's decision, he ordered defendant to implement a training program in manual communication at Blaine by January 17, 2002. CPS administration asked Alana Purcell[6], a CPS itinerant teacher within the deaf and hard of hearing program, to develop and teach a beginner sign language class to CPS staff that would be working with Peter. Ms. Purcell developed a six-session training program, each session lasting one hour, and testified that she believed this to be a good start to sign language and that ongoing training could be provided if needed. In her course, Ms. Purcell incorporated all the signs from the initial sign dictionary Peter's mother provided her, which was current through September 2001; however, she only included a small portion of the signs from two updates to Peter's sign dictionary she subsequently received from Belle Center. Ms. Purcell testified that she omitted religiously-based words and after that, prioritized those signs that were most likely to be used in a preschool setting.

Ms. Purcell taught the staff the manual alphabet and basic finger spelling because many of the signs incorporate the letters. There is conflicting evidence as to the extent the term "total communication" was discussed and incorporated in the class, beyond the first day. But, Ms. Purcell stated she used total communication throughout the training, which involves simultaneous use of speech and sign. The participants in the course were quizzed but not formally tested. Ms. Purcell expected participants to be able to use a few hundred signs, but noted that receptive use of signs is harder and participants may be able to understand 100 signs receptively. When pre-school teacher

---

[6]This court notes that plaintiffs challenge Ms. Purcell's credentials and allege that Ms. Purcell lied about attending two interpreter classes early in her career. It is undisputed, however, that Ms. Purcell has completed an interpreter training program and has experience teaching sign language courses.

Ms. Rice was asked how many signs in the dictionary she felt she could use in a spontaneous way, she testified that it was less than half. No additional training was scheduled, but CPS case manager Ms. Kinsey testified that the training program was to be open-ended and flexible based on the needs of the staff working with Peter.

In his decision, IHO Brimer ordered training for all direct service providers to Peter, including the general education preschool teacher, the teacher's assistant, the itinerant teacher, the speech/language pathologist, the physical therapist, the occupational therapist, and specialized professionals such as the art, music, physical education, and computer teacher. IHO Brimer encouraged, but did not require, the attendance of the principal, librarian, nurse, and bus driver. The following members of Blaine staff who would provide Peter services actually attended the training: the school nurse, occupational therapist, music teacher, art teacher, principal, teaching assistant, speech pathologist, computer teacher, physical education teacher, school engineer, physical therapist, and pre-school teacher. Ms. Rice, the pre-school teacher, missed the first two sessions due to illness, but received the materials she missed. The principal missed two sessions, and the teaching assistant missed one session. There was testimony that the CPS staff was enthusiastic and hardworking. The CPS itinerant teacher Mary Alice Lavin, who was to assist in Peter's transition to Blaine, did not participate in the training. Ms. Kinsey testified that the reason was because Ms. Lavin had already worked with Peter for two years and had a sign proficiency of 200-300 signs. The Spanish teacher also did not participate in the training because Ms. Kinsey stated it would be too confusing to introduce Spanish signs to Peter. There is conflicting evidence in the record as to whether sign is a universal language that the Spanish teacher could have used with Peter.

## G. Transition Issues

In his decision and order, IHO Brimer also discussed whether a mid-year transfer of Peter from St. Andrew to Blaine would be harmful. Defendant presented evidence that Peter successfully transferred from St. Andrew to a summer program at Resurrection during the summer of 2001. Peter had a difficult time acclimating to the new school during the first several weeks, but ultimately adjusted and transitioned smoothly. His Belle Center service providers were assisting at Resurrection as well. At the 2001 Hearing, six people testified that Peter should not transfer out of St. Andrew to Blaine in the middle of the school year. However, only two of these witnesses actually worked with Peter in his transition from St. Andrew to Resurrection and these two witnesses testified that while the initial couple weeks at Resurrection were difficult, Peter ultimately adjusted and transitioned well. The Resurrection staff and surroundings were new to Peter. The teachers of the summer program at Resurrection used sign in conjunction with verbal words to communicate with Peter, but did not sign every word.

## H. Events of January and February 2002

After IHO Brimer issued his decision and order, Kathy Kinsey sent Peter's parents a letter on January 7, 2002, informing them that Peter could start attending Blaine on January 28, 2002, and that if they intended for him to attend Blaine, they had to register Peter before this date. Ms. Kinsey testified that Peter needed to be enrolled before transportation could be arranged and services begun. The record reveals some confusion ensued as to whether Peter needed to be registered at Blaine. Plaintiffs' attorney sent a letter to Kathy Kinsey requesting clarification as to why Peter needed to register, stating that Peter was registered at Blaine in May 2000 and that all registration information from that time remained current. Ms. Kinsey never responded to that request and plaintiffs never

14

followed-up.

Defendant states that Peter had been enrolled as a non-attending student in May 2000 and needed to be re-enrolled as an attending student. Further, defendant argues, Peter had been enrolled at and attending St. Andrew since September 2000. Plaintiffs highlight evidence in the record that in January, 2002, no schedule for special education services for Peter had been scheduled and no other meetings were held at Blaine other than those related to the sign language training class. Mary Alice Lavin was not informed of the January 28, 2002 start date for Peter. Defendant contends that this was due to the fact that Peter was not registered as an attending student at Blaine. On January 25, 2002, defendant's contend they still did not know whether Peter was going to enroll and attend Blaine, while plaintiffs allege they had clearly indicated their intent.

In any event, Peter and his mother arrived at Blaine on the morning of January 28, 2002 after the bus failed to pick Peter up. After checking in at the principal's office, Peter and his mother arrived at Ms. Rice's pre-school classroom at 8:20 a.m. Christine Boucher, the case manager and school counselor at Blaine also arrived in Ms. Rice's classroom around that time, after being informed of Peter's and his mother's arrival. Neither Ms. Boucher nor Ms. Rice expected Peter's arrival that day. Class had been underway for twenty minutes when they arrived, and Ms. Rice continued with the lesson and did not stop to greet Peter or sign to him. Ten minutes later, at 8:30 a.m., Ms. Rice explained that Spanish class would be next and then asked the aid, Mr. Gomez, to go over by Peter. Peter crawled to Mr. Gomez, and it is disputed whether Mr. Gomez signed a few words to Peter about a book. The Spanish teacher then began her lesson, without using sign. Ms. Rice approached Peter's mother and asked if she was staying and Peter's mother responded yes, because nobody was signing. Ms. Boucher told Peter's mother that she did not know Peter was

coming to Blaine that day. Peter's mother was angry and upset and stated that people were not doing what they were supposed to be doing. An angry conversation ensued between Ms. Boucher and Peter's mother, and then Peter's mother and Peter left shortly thereafter. Peter's mother took Peter to St. Andrew, where Mary Alice Lavin, the CPS itinerant teacher, was waiting to provide services to Peter. Ms. Lavin had not been informed that Peter would be starting at Blaine on that day. Ms. Rice stated that she believed Peter's mother's conduct was disruptive and was not the proper way to transition Peter into the classroom. After this event, Ms. Rice felt anxious about working with Peter's mother and told Ms. Boucher that she wanted support in the classroom and during the transition time for her comfort level and for Peter's transitional comfort level.

Peter's mother returned to Blaine on February 21, 2002 to discuss transitioning Peter from St. Andrew to Blaine and she registered Peter at the time. At the meeting, it was decided that Peter could start at Blaine on February 25, 2002 in Ms. Rice's classroom from 8:00 a.m. to 10:30 a.m. Ms. Lavin met with Ms. Rice three times the next day to set up the classroom. A schedule for the first week was created for Ms. Lavin to be in Peter's classroom to support the staff and assist with Peter's transition. The schedule provided for Ms. Lavin to be in the classroom from 7:30 a.m. to 10:05 a.m. on Monday and Wednesday, 7:30 a.m. to 9:00 a.m. on Tuesday and Thursday, and from 7:30 a.m. to 9:30 a.m. on Friday. The schedule was only created for the first week, but Kathy Kinsey stated that Ms. Lavin's assignment was open-ended and would be extended if necessary. Follow-up sign language training had not been scheduled at that time. Ms. Rice expressed some anxiety about signing to Peter and considered requesting an aide who would also sign. Peter's parents did not to send Peter to Blaine due to their belief that there would not be one person with sufficient sign language proficiency in the classroom with Peter at all times.

16

## I. Peter's Progress

Peter's mother states that Peter's expressive sign vocabulary now exceeds 350 words and he continues to expand the number of multiple word sign combinations he uses. Suzanne Carr's report of August 8, 2002 states that Peter continues to make progress in all areas of development, developing and expanding his sign vocabulary while his verbal vocabulary is reported at nine words and seven approximations of words.

## J. Supplemental Expert Testimony

In addition, plaintiffs presented expert testimony criticizing the training program developed by Alana Purcell, citing various reasons for its inadequacy, including the course's basic introduction to sign language and limited vocabulary use, especially spontaneous use, the lack of formal assessment, and the credentials of Ms. Purcell. CPS introduced rebuttal expert testimony stating that Ms. Purcell's training program provided sufficient training for the staff to work with Peter initially and as Peter progressed, on-going training could be provided to meet his needs as well as those of his providers. She further found that most Down Syndrome children learn to speak and a teacher would sign key words in working with Peter. This court notes both sides in this case have challenged the other's expert's credentials.

## STANDARD OF REVIEW

Section 1415(i)(2)(B) prescribes the scope of and procedure for judicial review of administrative agency decisions under IDEA:

> In any action brought under this paragraph, the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2).

In <u>Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 206, 102 S.Ct. 3034 (1982), the Supreme Court held that this statutory provision should not be read as "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Instead, in reviewing the record, courts must accord "due weight" to the results of the administrative proceedings. <u>Heather S. v. State of Wisconsin</u>, 125 F.3d 1045, 1052-53 (7th Cir. 1997). "'Due weight' necessarily implies some sort of deference to the agency's decision, and considering the officer's special expertise in education law, we think a sound basis exists for giving deference to the decisions of the hearing officers." <u>Id.</u> At 1053. The "due weight" which this court must give to the hearings below is "not to the testimony of witnesses or to the evidence–both of which this court must independently evaluate–but to the decisions of the hearing officers." <u>Id.</u> Accordingly, this court will independently evaluate the evidence in the record, while viewing IHO Brimer's decisions through a deferential lens.

The IDEA entitles a disabled child to a "free appropriate public education" ("FAPE") tailored to his or her disability. 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A). A FAPE is an education that is specifically designed to meet the unique needs of the disabled child, supported by such services as are necessary to permit the child to benefit from the instruction. <u>See</u> <u>Todd v. Duneland School Corporation</u>, 299 F.3d 899, 905 (7th Cir. 2002) (citing <u>Rowley</u>, 458 U.S. at 188-89, 102 S.Ct. 3034). The school district, however, is not required to provide the best possible education. <u>See id.</u> In determining whether a FAPE has been provided as required under the IDEA, this court must ask: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" <u>Rowley</u>, 458 U.S. at 206-07, 102 S.Ct. 3034.

18

"The educational methods are left up to the states; they are obligated only to comply with the requirements of the IDEA . . . once the school district has met these two requirements, the courts cannot require more." Heather S., 125 F.3d at 1054. The purpose of the IDEA "is to open the door of public education to handicapped children, not to educate a handicapped child to her highest potential" and the school district has met the substantive requirements of the IDEA if its proposed placement is "reasonably calculated to be of educational benefit" to the disabled child. Id. Federal courts "must defer to the judgment of education experts who craft and review a child's IEP so long as the child receives some educational benefit and is educated alongside his non-disabled classmates to the maximum extent possible." School District of Wisconsin Dells v. Littlegeorge, 295 F.3d 671, 676-77 (7th Cir. 2002).

Although the parties in this case filed motions for summary judgment, "this type of IDEA decision does not fit neatly into the generic definition of such a disposition." Beth B. v. Van Clay, 282 F.3d 493, 1496 n.2 (7th Cir. 2002). Despite being termed summary judgment, as discussed above, the standard for review in IDEA cases is unique. This court decides the merits based on the preponderance of the evidence, giving "due weight" to the IHO's determinations. See 20 U.S.C. § 1415(i)(2). Therefore, in this type of IDEA review, "summary judgment has been deemed appropriate even when facts are in dispute, and is based on a preponderance of the evidence." Beth B., 282 F.3d at 1496 n.2. This court's inquiry, therefore, is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that Peter's educational needs have been appropriately addressed. As the Ninth Circuit aptly stated, "[b]ecause this appears to be what Congress intended under the Act, we conclude it is the right thing to do, even

though it does not fit well into any pigeonhole of the Federal Rules of Civil Procedure." Capistrano

Unified School Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995); see also Patricia P. v. Board

of Educ., 203 F.3d 462, 466 (7th Cir. 2000) (describing summary judgment as "simply the

procedural vehicle for asking the judge to decide the case on the basis of the administrative record");

Beth B. v. Van Clay, 211 F.Supp2d 1020, 1026 (N.D. Ill. 2001) (stating that perhaps the court's

IDEA decision "is better described as judgment on the record rather than summary judgment"), aff'd

282 F.3d 493. Finally, the party challenging the administrative finding, plaintiffs in this case, bears

the burden of proof. See Board of Educ. of LaGrange School Dist. No. 105 v. Illinois State Board.

of Educ., 184 F.3d 912, 915 (7th Cir. 1999).

## ANALYSIS[7]

### I. Procedural Violations

This court's first inquiry under Rowley is whether defendant has complied with IDEA

procedures. See Rowley, 458 U.S. at 206, 102 S.Ct. 3034. "Procedural flaws do not automatically

require a finding of a denial of a FAPE"; the question is whether the flaws deprived the student of

what the law requires. Heather S. v. State of Wisconsin, 125 F.3d 1045, 1059 (7th Cir. 1997).

Procedural inadequacies that do result in the loss of educational opportunity result in the denial of

a FAPE. Id.

---

[7]Plaintiffs' first amended complaint contains three counts. In the following analysis, this court addresses Counts II and III, which consist of the appeal of IHO Brimer's decision and order in the 2001 Hearing pursuant to 20 U.S.C. § 1415(i)2). As noted earlier, in Count I, pursuant to 20 U.S.C. § 1415(i)(3)(B), plaintiffs seek $10,426.91 in fees and costs incurred in the administrative proceeding against defendant that was initiated in December 2000. The only remaining dispute as to count I is whether this court should enter an offer of judgment pursuant to Rule 68. On November 20, 2002, defendant CPS Board offered plaintiffs' counsel $10,426.91 in full settlement of count I. (Def.'s Mem. in Resp. to Pl.'s Mot. for Summ. J. at 1 n.1.) Plaintiffs request, and this court enters, a Federal Rule of Civil Procedure 68 offer of judgment in the amount of $10,426.91 against defendant and in favor of plaintiffs as the prevailing party in count I.

A. Timely Implementation of Peter's IEP

First, plaintiffs contend that defendant failed to implement Peter's 2001 IEP in a timely manner as prescribed by 34 C.F.R. § 300.342, which requires a school district to implement a student's IEP "as soon as possible" after the IEP meeting, and 23 Ill.Admin.Code § 226.200(c)(1), which requires the IEP to occur no later than ten days after the IEP is developed. On July 30, 2001, Peter was formally placed in preschool teacher Michelle Jones' regular preschool class at Brennenman with special education services pursuant to his 2001 IEP. Plaintiffs argue that CPS failed to implement Peter's IEP because CPS did not send Peter's IEP to Ms. Jones. Further, Ms. Jones had no knowledge of sign language or total communication and was not trained. When Peter's placement was changed to Blaine in October 2001, plaintiffs complain that the preschool teacher Ms. Rice, the teacher's aide Mr. Gomez, and the speech pathologist, Fred Breskamp, needed prior training in order to provide services to Peter, and no training was provided to Blaine staff until January 2002.

First, as defendant contends, and this court agrees, plaintiffs did not raise this issue before IHO Brimer at the 2001 Hearing and thus failed to preserve this issue for this court's judicial review. Plaintiffs cite to the portion of IHO Brimer's Prehearing Conference Report (AR 032) and his decision and order (AR 004) that addresses whether the school district notified Peter's parents of an appropriate placement in a timely manner. However, plaintiffs have mistakenly equated the issue of timeliness of defendant's notice of the 2001 IEP meeting to timeliness of the implementation of the 2001 IEP. The former issue was raised and discussed before IHO Brimer; the latter was not and therefore was not properly preserved for judicial review.

Even considering plaintiffs' argument as to the timeliness of the 2001 IEP's implementation

on the merits, this court finds no procedural violation resulting in the denial of a FAPE to Peter. As to the IEP implementation at Brennenman, Peter's parents rejected even the possibility of Peter's placement at Brennenman on July 23, 2001 after the 2001 IEP conference, before any formal placement had been made. In September 2001 when Peter's mother visited Brennenman and found the school ill-prepared to implement the 2001 IEP, Peter's mother had already rejected the placement at Brennenman and had enrolled Peter at St. Andrew for the 2001-2002 school year. Although the 2001 IEP had been developed and the IDEA required implementation in a timely fashion, the 2001 IEP placement had been rejected by Peter's parents and they had filed for a due process hearing. This court does not find that defendant's failure to train Brennenman staff and to further implement the 2001 IEP at Brennenman, when it appeared that Peter's parents intended to have Peter attend St. Andrew and not Brennenman, constitutes a procedural violation under the IDEA which denied Peter a FAPE. Similarly, this court does not find defendant's failure to begin training Blaine staff or to design a transitional program prior to January 2002 constitutes a procedural violation which denied FAPE to Peter. While Peter's placement at Blaine was decided in October 2001, Peter's parents had not yet accepted the placement at Blaine and still had Peter enrolled at St. Andrew. It was unclear whether Peter's parents would accept Peter's placement at Blaine and there was some indication based on the their actions that they would not. Given these circumstances, this court finds CPS did not fail to implement the 2001 IEP in a timely manner which resulted in a denial of FAPE to Peter.

B. Failure to Develop Appropriate Goals

Next, plaintiffs contend that the defendant failed to develop appropriate goals in the 2001 IEP, goals which were commensurate with Peter's present level of performance, as required by 34 C.F.R. § 300.342. Again, plaintiffs did not raise this issue before IHO Brimer and thus did not

preserve it for judicial review by this court. This court also notes that plaintiffs raise this challenge as a procedural violation, when it appears to be a substantive challenge to Peter's 2001 IEP. Consequently, this court will address this issue further in this court's substantive inquiry discussed at *infra* section II .

### C. Proper Notice of IEP Team Participants

Under 34 C.F.R. § 300.345 (b), the school district is required to provide notice of the participants in a student's IEP meeting to a student's parents prior to the IEP meeting. Here, there were four people who attended Peter's 2001 IEP conference which were not listed on the notice form defendant sent to Peter's parents. IHO Brimer considered this issue in the 2001 Hearing and found that this violation was not enough to invalidate Peter's IEP. This court agrees. A procedural flaw alone does not constitute a *per se* violation of the IDEA. See Heather S. v. State of Wis., 125 F.3d 1045, 1059 (7th Cir. 1997). The procedural flaw must cause harm to Peter by causing a loss of a FAPE. See id. Plaintiffs have not presented any evidence in the record that the attendance of the four CPS representatives without prior notice to plaintiffs in any way caused Peter to suffer a loss of a FAPE. The main objection plaintiffs raise is that several of the CPS representatives who signed in as "speech pathologists" at the 2001 IEP conference were, in addition to being speech pathologists, also CPS administrators. For example, Ms. Roberta Silver, whose name was not on the advance notice, signed in at the IEP meeting as a speech pathologist and it was later revealed during the due process hearing that Ms. Silver also supervised 90 CPS Board speech pathologists. This court does not find this procedural violation constitutes, as plaintiffs urge, "subterfuge in the design of an educational program" for Peter.

23

D. Failure to Provide School Records to Peter's Parents

On the same day that plaintiffs' counsel submitted a formal request for a due process hearing to review Peter's initial placement at Brennenman, plaintiff's counsel submitted a request for various parts of Peter's school record. Plaintiffs maintain that since the 2001 Hearing, plaintiffs have received numerous documents which should have been made available to them prior to the 2001 Hearing, including: IEP Report cards for January 2001 and June 2001, CPS itinerant teachers' notes and reports about Peter for the 2000-2001 school year. However, plaintiffs simply attach a host of documents to their motion and it is unclear from the record exactly when Peter's parents received particular documents. Moreover, plaintiffs have not provided any evidence, beyond their own self-serving assertions, as to how the lack of ceratin alleged documents or records actually prejudiced their ability to present evidence to IHO Brimer and resulted in the denial of a FAPE to Peter.

E. Inclusion of Appropriate Members of IEP Team

Under 34 C.F.R. § 300.344(a)(2), CPS was required to ensure that the IEP team for Peter's 2001 IEP conference included "at least one regular education teacher of the child (if the child is, or may be, participating in the regular education environment)." The IEP team for Peter's 2001 IEP conference included Deanna Hunt, who signed in as a regular education teacher and is a gym teacher at Blaine. According to the record, during the 2001 Hearing, plaintiffs contested Ms. Hunt's participation as a "regular education teacher" because she was a gym teacher, and also complained that Ms. Hunt had no knowledge of sign language and said nothing during the five hour IEP meeting. IHO Brimer found Ms. Hunt to be a regular education teacher of Peter under the IDEA and that the IDEA did not require the general education teacher "to possess any unique or specialized skill that would vary from IEP meeting to IEP meeting depending on the ability, skills, or traits of the

student." (AR at 12.)

In their motion for summary judgment, plaintiffs appear to be arguing again that Ms. Hunt does not constitute one of Peter's "regular education" teachers under the IDEA because she was not the head classroom teacher Brennenman or at Blaine. Plaintiffs complain that either Ms. Jones from Brennenman or Ms. Rice from Blaine should have been at the 2001 IEP conference to participate in the discussion of Peter's IEP programs. This court did not hear supplemental evidence on this issue. Based upon the record and the applicable law, this court does not find IHO Brimer's decision that Ms. Hunt qualified as a regular education teacher and that her lack of sign language knowledge before participating in the IEP conference denied Peter of FAPE to be clearly erroneous. See School Dist. of Wis. Dells v. Littlegeorge, 295 F.3d 671, 675 (7th Cir. 2002) (When no fresh evidence is taken, the fact that the district judge disagrees with the administrative law judge or other administrative hearing officer "is not enough to justify setting aside the latter's order; he must be strongly convinced that the order is erroneous" and the district judge "owes considerable deference to the reviewing officer."). This is "just another way of stating the clear-error or substantial-evidence standard." Id. This court will not, nor should it, second guess IHO Brimer's educational policy determination that Ms. Hunt's attendance as a regular education teacher who would be working with Peter at Blaine was sufficient to satisfy the IDEA. While this court recognizes that it would have been beneficial to Peter to have Ms. Jones' or Ms. Rice at the conference to discuss total communication and sign language training, this court cannot conclude that their absence from the 2001 IEP conference resulted in a denial of FAPE to Peter, thus invalidating the 2001 IEP.

II. Substantive Inquiry

This court's second inquiry under Rowley is whether defendant's proposed 2001 IEP was

"reasonably calculated to enable [Peter] to receive educational benefits." Rowley, 458 U.S. at 207, 102 S.Ct. 3034. The issue is whether the defendant's proposed placement was appropriate, "not whether another placement would also be appropriate, or even better for that matter." Heather S., 125 F.3d at 1057. The defendant is required to provide an appropriate education, "not the best possible education" or the education parents prefer. Id. A school district satisfies its requirements under the IDEA by:

> providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the state's educational standards, must approximate the grade levels used in the state's regular education and must comport with the child's IEP. Rowley, 458 U.S. at 203.

There is not "any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." Id. at 202. The appropriate concern is finding a program which will be of educational benefit to the child. See Board of Educ. of Community Consol. Sch. Dist. No. 21 v. Illinois State Board of Educ., 938 F.2d 712, 717 (7th Cir. 1991).

A. Adequacy of 2001 IEP Goals

Plaintiffs raise several challenges to the educational goals drafted for Peter during the 2001 IEP conference. Specifically, plaintiffs contend that in the 2001 IEP, the communication goals do not address expansion of Peter's sign vocabulary, Peter's present level of sign performance is described as "some signs and intermittent vocalizations" (AR 40), Peter's language is listed as "English" for all goals except communication, which lists "English and Sign" (AR 163-64), the term "developmental sign" is used in the IEP although two IEP participants did not understand the term, and the physical therapy goals were written by Stacy Knowles, a CPS physical therapist who had not seen Peter for 12 months prior to the IEP meeting. Upon review of the record, this court does not

26

find that based upon a preponderance of the evidence, the drafted goals were inadequate and failed to provide Peter with a FAPE.

Several participants from the 2001 IEP conference testified that there appeared to be agreement reached by all participants as to the educational goals drafted that day. IHO Brimer found in his decision that "[f]rom the testimony of the witnesses who attended the IEP conference, the Parents and their representatives were given an ample opportunity to discuss any issue, raise any point or propose any goal relative to their son's proposed program." (AR at 8.) There is no evidence in the record that any goal proposed by either Peter's parents or plaintiffs' expert, Suzanne Carr, was rejected by defendant. To the contrary, the record reflects that the parents and their representatives were very involved in the meeting and the participants worked together for many hours to draft the final IEP. When asked whether she was in agreement with the drafted goals, Suzanne Carr testified that she agreed with "a portion" of the goals, but noted that "I think they are a portion of his goals. I don't think they state all that could be accomplished and achieved in a year's time." (AR 1387). Ms. Carr then testified that she felt the IEP created by the Belle Center contained more independent goals. The fact that Ms. Carr felt that the 2001 IEP could have contained more goals or better goals, does not mean that the 2001 IEP goals were not reasonably calculated to provide Peter an educational benefit.

As to Stacy Knowles, the CPS physical therapist who drafted Peter's physical therapy goals having not seen Peter for a period of 12 months prior to the IEP meeting, plaintiffs have not presented any evidence or argument as to *how* the physical therapy goals were inadequate under the IDEA due to Ms. Knowles lack of recent interaction with Peter. As discussed in *infra* section I, a procedural deficiency alone, without a showing of denial of FAPE to Peter is not enough to

invalidate the 2001 IEP. Further, this court agrees with IHO Brimer's holding that the "IDEA does not mandate that every participant work with the Student prior to the meeting." (AR 12.) This court finds that CPS did not violate the requirements of the IDEA in the development and drafting of Peter's 2001 IEP goals such that a denial of FAPE resulted.

B. September, 2001

   Plaintiffs contend that defendant failed to provide Peter with a FAPE in September 2001 because Ms. Jones, the classroom teacher at Brennenman School was not trained in sign language and had no training in providing inclusion services for special education children. In September 2001, Peter's mother, along with case manager Kathy Kinsey and Belle Center Executive Director Debbie Stengel, toured Brennenman school and discovered that the Brennenman staff had not been trained in sign language. However, as discussed *infra* in section I.A., at the time, plaintiffs had already rejected the 2001 IEP placement at Brennenman school and had enrolled Peter at St. Andrews for the 2001-2002 school year. Plaintiffs' actions indicated they had no intention of enrolling Peter in Brennenman for that school year. This court does not find, based upon the preponderance of the evidence, that defendant denied Peter a FAPE in failing to train the staff at a placement school which Peter's parent's had rejected and where Peter was never enrolled and never attended.

   In October, 2001, Peter's placement was shifted to Blaine. Plaintiffs argue that defendant denied Peter a FAPE when it failed to implement a training program for Blaine staff in October and November 2001. Plaintiffs correctly contend that the 2001 IEP provided for Peter's placement in a regular education classroom with Blaine staff using total communication, and that neither Ms. Rice nor her aid knew sign language in October 2001 when Peter's placement shifted to Blaine. Plaintiffs

also correctly note that the 2001 IEP goals could not be implemented without prior training of Blaine staff. Again, as discussed *infra* in section I.A., after Peter's placement was shifted, it remained unclear whether plaintiffs were going to have Peter attend Blaine as Peter was still enrolled at St. Andrew. Peter had never visited or attended Blaine up until January 28, 2002. Under the circumstances in October, 2001, with Peter still at St. Andrew, with plaintiffs still challenging the 2001 IEP, and with no indication that Peter's parents would ever place Peter at Blaine, this court finds that defendant did not deny Peter a FAPE when it did not implement a training program at Blaine prior to IHO Brimer's December 2001 decision that the 2001 IEP did not deny Peter a FAPE and his order that defendant implement a training program. There was no indication that Peter would ever be attending Blaine until IHO Brimer's December 2001 decision.

C. Mid-Year Transfer

At the 2001 Hearing before IHO Brimer, plaintiffs presented the testimony of six people concerning the harmful effects of changing Peter's placement in the middle of the school year. Defendant, on the other hand, highlighted evidence of Peter's successful transition from St. Andrew during the 2000-2001 school year to Resurrection during the summer of 2001 for the extended school year program. IHO Brimer considered the evidence and held:

> If it should be ordered that the Student be educated at the public school rather than continue to be educated at the private school, when should the Student be placed in the public school? Two of the Parents' expert witnesses testified that the only acceptable time will be at the end of the school year. At the same time, both the School District's witnesses and Parents' witnesses indicated that the Student quickly adjusted to the extended school year program. The extended school year program employed different teachers, was located in a different site, utilized a different routine and had different classmates than the private school program. Yet, in the extended school year program, the Student succeeded, improved and developed new relationships with his classmates and teachers. This would suggest that the Student could successfully adjust to a change from the private school to the public school.

29

(AR 12-13.)

Weighing the evidence under a preponderance of the evidence standard, and keeping in mind the proper deference owed to IHO Brimer's decision, this court does not find that transferring Peter in the middle of the school year would have more likely than not deprived Peter of an educational benefit.

While plaintiffs experts did testify that Peter would suffer some harmful effects if he changed schools in the middle of the school year, the testimony in the record does not indicate how or why this would prevent Peter from receiving a FAPE. Plaintiffs' experts' testimony was that changing schools would not be in Peter's best interest and that it would be frustrating, would affect Peter socially and academically, and would be difficult and disruptive for Peter. This court notes that only two of plaintiffs' witnesses actually observed or worked with Peter during his transition to Resurrection from St. Andrew during the summer of 2001, and those witnesses testified that while the initial weeks were difficult for Peter, the transition was ultimately successful. This court acknowledges that transferring Peter in the middle of the school year would likely be more difficult and frustrating for Peter initially than transferring him at the beginning of the school year, but plaintiffs have not established by the preponderance of the evidence in the record that the mid-year transfer would deny Peter an educational benefit. Therefore, this court affirms IHO Brimer's determination that transferring Peter mid-year would not deny Peter a FAPE.

D. Adequacy of Training of Blaine Staff

In his decision and order, IHO Brimer ordered defendant to develop a program to provide instruction in manual communication to Blaine service providers. In response to IHO Brimer's order, defendant initiated a six-session training program designed and delivered by CPS itinerant

30

teacher Alana Purcell. Plaintiffs contend that defendant failed to implement IHO Brimer's order because the training was inadequate and, as a result, Peter was denied a FAPE.

IHO Brimer directed that all staff involved in providing service to Peter participate in training. Plaintiffs argue that the training was insufficient under the IDEA because three service providers did not participate in the training; CPS itinerant teacher Mary Alice Lavin, a Spanish teacher, and a Suzuki teacher. First, the Suzuki teacher is not a CPS Board employee, and thus could not be required to participate in the training. It is significant to note that the Blaine music teacher who is a CPS employee did attend the training. As to Mary Alice Lavin, defendant presented evidence that she was not required to participate in the training because she had already worked with Peter for over one year, had a sign vocabulary of 200-300 signs, and was familiar with Peter's expressive and receptive signs. In addition, Ms. Purcell testified that having a training participant who was far more advanced than the other participants could have a chilling effect on the class. Plaintiffs challenge the credibility of this statement by presenting evidence that two other participants in the class had prior experience in sign and Ms. Purcell referred to them as her "star" students. There is no evidence that these two participants' experience in and knowledge of sign was comparable to Ms. Lavin's, and there is no evidence that their presence in the class had any negative impact on the class. Finally, plaintiffs object to the Spanish teacher's failure to attend training. Defendants explain that the Spanish teacher was not included in training because it was determined that it would be too confusing to Peter to introduce Spanish signs at this point. Plaintiffs cite to evidence that sign is universal, with no difference in Spanish or English. Defendant presents evidence that different languages have their own sign languages and there is not a universal sign language.

31

This court's review of the IEP implementation, however, does not turn on the veracity of defendant's justification for the Spanish teacher's lack of training; this court must instead determine whether the training program was "reasonably calculated to enable [Peter] to receive educational benefits." Rowley, 458 U.S. at 206-07, 102 S.Ct. 3034. While this court acknowledges that basic training on Peter's signs for the Spanish teacher would have been beneficial to Peter, this court is cognizant that it "must defer to the judgment of education experts who craft and review a child's IEP so long as the child receives some educational benefit and is educated alongside his non-disabled classmates to the maximum extent possible." School of Wis. Dells v. Littlegeorge, 295 F.3d 671, 676-77 (7th Cir. 2002). Defendant required twelve Blaine service providers to attend the training, including the school nurse, occupational therapist, music teacher, art teacher, principal, teaching assistant, speech pathologist, computer teacher, physical education teacher, school engineer, physical therapist, and pre-school teacher. Independently viewing the evidence in the record and the supplemental evidence submitted, this court does not find by a preponderance of the evidence that the training program was not reasonably calculated to enable Peter to receive educational benefits. Therefore, this court will not invalidate the 2001 IEP and training program because it failed to include the Spanish teacher.

Plaintiffs also argue that the program was too short to equip teachers with sufficient sign language skills to function in a preschool classroom with Peter. First, plaintiffs argue that the training offered by defendant did not equip the staff with a level of sign proficiency that was at or slightly above Peter's level. During the 2001 Hearing, the parties contested exactly how many signs Peter actually knew. Peter's mother testified at the 2001 Hearing that Peter had a repertoire of 174 signs and plaintiffs' expert Suzanne Carr, who works with Peter one hour a week, testified that in

May 2001, Peter knew 140-150 signs. It is unclear from the record whether Ms. Carr reached this figure by direct knowledge and observation or whether it was reported to her by Peter's parents. There is no formal evaluation in the record of Peter and the number of signs he knows. Defendant cites to the testimony in the record of a number of teachers and staff who worked with Peter prior to the 2001 Hearing stating that Peter used between 20 and 75 signs.

In the training course, Ms. Purcell trained Blaine staff in approximately 300 signs. Ms. Purcell taught from a sign dictionary provided to her by Peter's mother, containing the signs Peter knew. Ms. Purcell states that she expected most participants in her training program to "use a few hundred signs" but also stated that "it's much harder to understand receptively" and she expected participants to understand 100 signs receptively. Plaintiffs highlight Blaine pre-school teacher Ms. Rice's testimony that she felt that after training she felt she could use less than half of the signs taught in a spontaneous way. Ms. Rice missed the first two training classes due to illness, but Ms. Purcell stated that she used repetition and review in subsequent classes and provided Ms. Rice with all the materials. Ms. Rice also expressed reservations about signing in her class after Peter's mother appeared in Ms. Rice's classroom on January 28, 2002. Ms. Rice stated that after Peter's mother disrupted her class and addressed her in an angry manner, Ms. Rice feared that she would be judged and criticized in her efforts to use sign language with Peter. Ms. Rice also stated that she feared Peter's mother would not be collaborative and indicated she would request another aide in the classroom.

First, this court finds that a preponderance of evidence in the record supports the proposition that at the time of the 2001 Hearing, Peter was using between 20-75 signs, even though Peter's mother and Suzanne Carr state otherwise. There is no formal evaluation of Peter on the record and

33

therefore, this court must look to all the testimony and weigh it accordingly. At the 2001 Hearing, Peter's independent physical therapist Margo Maresky testified that she knew at least 50 words, maybe more, and that her use of sign enabled her to communicate with Peter and teach him. (AR 1436.) Peter's Belle Center occupational therapist Polly Toner who had been working with Peter weekly since October 2000 testified that she saw Peter use about 50 signs on a regular basis. Itinerant teacher Paula Polak who worked with Peter from October 2000 to June 2001 testified that she learned 25 signs during that time as she worked with Peter and there were only a few times she did not understand Peter's signs. CPS occupational therapist Connie Bickford testified that she knew about 20 signs and was able to work with Peter although she did not know all signs Peter used. Mary Alice Lavin, CPS itinerant teacher, had worked with Peter for over two years at the time of the 2001 Hearing, and had a sign vocabulary of between 200 to 300 signs. She testified that she has not seen Peter use 170 signs and did not know how many signs he knew, and that occasionally, but not often, Peter used a sign she did not understand. Debbie Mytych, the director at Resurrection, estimated that Peter knew around 50 to 75 signs, and used "same ones over and over for common things." (AR 1188.) Mrs. Mitchell, Peter's teacher at St. Andrews who saw him five days a week did not know how many signs Peter knew. Based on the preponderance of the evidence that Peter was using between 20-75 signs, this court finds that the training program provided by Ms. Purcell was reasonably calculated to provide Peter an educational benefit when he arrived at Blaine in January 2002. Even if the training program participants retained, at worst, a vocabulary of 100 signs receptively and expressively, it would still be slightly above Peter's vocabulary level.

This court agrees with IHO Brimer's finding that plaintiffs were holding the public school, Blaine, to a higher standard than they demanded of the private schools, St. Andrew and Resurrection,

and private service providers from Belle Center. Plaintiffs' expert Suzanne Carr testified that to

work with Peter, his instructor would need eight to nine months of formal training in sign language.

Plaintiffs' expert Lynn Pena testified that staff working with Peter needed at least two or possibly

three academic semesters of sign language, in addition to ongoing training, before they could even

begin to work with him. Plaintiffs' witnesses also testified that Peter's service providers should be

required to learn not only sign vocabulary, but also sign language grammar, syntax, and colloquial

usage. However, as IHO Brimer noted, only one teacher at St. Andrew, the lead teacher, had any

formal training in sign and that training consisted of three sign courses. Also, the record is unclear

as to whether she took those courses before Peter arrived; there is some evidence that she took a

course the summer before Peter began in her classroom. The other teacher and aide in Peter's

classroom at St. Andrew did not have any formal training and they learned sign on the job and from

the lead teacher. The teaching staff at Resurrection did not have any formal or informal training in

manual communication prior to Peter's enrollment in the program. Only Suzanne Carr, at Belle

Center, had any formal training prior to working with Peter. Ms. Carr took two sign language classes

10 years ago and picked up the rest of her 1200 signs on the job. Ms. Carr admits that her team from

Belle Center did not have the level of training she recommends for Blaine staff. Polly Toner, the

Belle Center occupational therapist who worked with Peter did not have any formal training in sign

language. She was trained informally by Suzanne Carr and received on-going informal training from

Ms. Carr, by self-study, and on-the-job experience. Ms. Toner stated that this has been sufficient

to meet Peter's needs in the classroom. Numerous other CPS Board staff testified that they were able

to successfully work with Peter despite their lack of formal training in sign. The record indicates that

the teachers and staff at St. Andrew and Resurrection, and Peter's mother, did not sign every word

with Peter—only key words. There is no evidence that any of the service providers at St. Andrew or Resurrection were fluent in sign, or the grammar, syntax, or colloquial usage of sign language. Even though plaintiffs present some evidence that Peter's sign vocabulary is consistently improving every year, this court finds, by a preponderance of the evidence, that the initial training program provided by Ms. Purcell was reasonably calculated to provide some educational benefit to Peter when he entered Blaine in January 2002. In this opinion and order, this court is not making the determination that on-going training and modification of services provided to Peter would not be necessary after Peter began at Blaine. However, in the event that it is, it is significant to note that defendant has consistently represented that any training or transitional services for Peter were open-ended and would be adjusted according to Peter's and the Blaine staff's needs.

### E. January and February 2002

Next, plaintiffs contend that defendant denied Peter a FAPE because Blaine was wholly unprepared for Peter when Peter and his mother arrived on January 28, 2002. First, plaintiffs state that in January 2002, no schedule for special education services for Peter had been scheduled, no other meetings were held at Blaine other than those related to the sign language training class, and no Blaine staff was notified that Peter was going to begin at Blaine on January 28, 2002. As recited in the statement of facts, the record contains conflicting evidence as to whether defendant and Blaine staff were, or should have been, aware that Peter was beginning on January 28, 2002. This court need not decide who is at fault for the lack of communication between Peter's parents and Blaine staff. The end result of the confusion is simply that Peter was not registered at Blaine as an attending student before January 28, 2002 and Blaine staff was unprepared for Peter when he arrived and no transition plan or special education services had been scheduled. This court does not find that this

fact alone invalidates Peter's 2001 IEP or the steps defendant had taken to implement the IEP. When Peter's parents registered Peter at Blaine approximately one month later on February 21, 2002, defendant and Blaine staff prepared Peter's class schedule and schedule for special services.

Mary Alice Lavin, CPS Board itinerant teacher who had worked with Peter for 1 year and was familiar with Peter's signs, was scheduled to be in Ms. Rice's classroom during Peter's first week for the majority of the time, to assist with Peter's transition. There is evidence that although Ms. Lavin was not scheduled beyond the first week, Ms. Lavin's schedule was open-ended and subject to change based on Peter's and Blaine staff's needs. For Peter's first week, he was scheduled to attend Ms. Rice's class from Monday through Friday from 8:00a.m. until 10:30a.m. Ms. Lavin was scheduled to be in Ms. Rice's classroom from 7:30 a.m. until 10:05a.m. on Mondays and Wednesdays, 7:30a.m. until 9:00a.m. on Tuesdays and Thursdays, and 7:30a.m. until 9:30a.m. on Friday. Plaintiffs contend that this schedule was inadequate because it left substantial portions of class time, a maximum of one hour and a half on Tuesdays and Thursdays, without anyone with sufficient proficiency in sign to communicate with Peter. Plaintiffs' position is that even after sign language training, the remaining Blaine staff would not be able to adequately communicate with Peter.

First, this court emphasizes again that a FAPE is one that is "specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." Todd v Duneland School Corp., 299 F.3d 899, 905 (7th Cir. 2002) (citing Rowley, 458 U.S. at 188-89, 102 S.Ct. 3034). The school district is "not required to provide the best possible education," so long as the IEP is reasonably calculated to provide some education benefit to the child. Id. This court finds that Peter's 2001 IEP and the steps defendant

took in January and February 2002 were reasonably calculated to provide some educational benefit to Peter. Defendant does not have to prove that Peter's placement at Blaine is pedagogically superior to his placement at St. Andrew. That an alternative placement or additional private services may benefit Peter does not negate the appropriateness, under the IDEA, of defendant's placement. See Heather S. v. State of Wisconsin, 125 F.3d 1045, 1057 (7th Cir. 1997) ("The issue is whether the . . . placement [is] appropriate, not whether another placement would also be appropriate, or even better for that matter."). This court acknowledges that plaintiffs have raised some valid concerns about Peter's placement at Blaine and whether Ms. Purcell's training program will prove to be adequate. However, Peter only actually stayed at Blaine for 15-20 minutes before his mother removed him. The Blaine staff was not given any fair opportunity to even attempt to work with Peter or utilize any sign language; this court can only speculate as to whether the sign language training would have been sufficient. This court cannot state with certainty that more than likely, Peter would not have benefitted educationally from his placement at Blaine. Further, there is evidence that the training course was designed to be a beginner's course, and that although further training had not been scheduled yet, defendant continues to represent that the training program was to be open-ended and flexible based on the needs of the staff working with Peter. The fact that some questions and uncertainties exist as to Peter's success at Blaine does not invalidate Peter's 2001 IEP and the initial steps taken to implement it.

This court recognizes that Peter's parents face many difficult decisions and this court appreciates the care and commitment with which they have participated in every level of Peter's education. Peter's parents' dedication and involvement are crucial to ensuring that Peter receives all of the benefits to which he is entitled under the IDEA. However, after an exhaustive review of

38

the record, this court finds that based upon a preponderance of the evidence in the record and in the supplemental evidence, defendant has complied with the procedural requirements of the IDEA and has developed an IEP which is reasonably calculated to enable Peter to receive educational benefits. Heather S., 125 F.3d at 1054. Because this court finds defendant has met these two requirements, this court "cannot require more." Id. The purpose of the IDEA is to "open the door of public education to handicapped children, not to educate a handicapped child to her highest potential," Id., and this court finds that defendant has satisfied the IDEA requirements in this case.

## CONCLUSION

For all the reasons stated above, this court grants summary judgment in count I in favor of plaintiffs and against defendant CPS Board in the amount of $10,426.91, and grants summary judgment in counts II and III in favor of defendants CPS Board and ISBE and against plaintiffs. This case is terminated in its entirety. Any pending motions are moot.

ENTER:

JAMES F. HOLDERMAN
United States District Judge

DATE: January 10, 2003

# United States District Court
## Northern District of Illinois
### Eastern Division

| | |
|---|---|
| PETER G.  et al | **JUDGMENT IN A CIVIL CASE** |
| v. | Case Number: 02 C 687 |
| CHICAGO PUBLIC SCHOOL DISTRICT  NO. 299  et al | |

☐　　Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■　　Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that summary judgment is entered in favor of plaintiffs and against defendant Chicago Public School District No. 299 in the amount of $10,426.91 on Count I and in favor of defendants  Chicago Public School District No. 299 and Illinois State Board of Education and against plaintiffs on Counts II and III.  This action is dismissed in its entirety.

Michael W. Dobbins, Clerk of Court

Date: 1/10/2003

J. Smith, Deputy Clerk